Filed 4/28/26  P. v. Roberts CA5

<u>**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>ROBERT PERNELL ROBERTS,<br><br>  Defendant and Appellant. | F088797<br><br>(Super. Ct. No. BF191473A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Judith K. Dulcich, Judge.

Kathy R. Moreno, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Ivan P. Marrs and Jennifer M. Poe, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant Robert Pernell Roberts challenges his convictions for murder, attempted robbery, and possession of a firearm as a felon on the grounds the trial court improperly admitted character evidence barred by Penal Code section 1101, and that there was insufficient evidence he possessed a firearm or committed an attempted robbery.  (Undesignated statutory references are to the Penal Code.)  We reject these claims and affirm the judgment.

## BACKGROUND

In an amended information, the Kern County District Attorney charged defendant with premeditated murder (§ 187, subd. (a); count 1), attempted robbery (§§ 664, 212.5, subd. (c); count 2), and possession of a firearm as a felon (§ 29800, subd. (a)(1); count 3).  The information further alleged the murder was committed by means described in section 189 and was committed during the attempted commission of a robbery.  (§ 190.2, subd. (a)(17).)  The information also alleged personal firearm use enhancements (§ 12022.53, subd. (d)) as to counts 1 and 2.  The information further alleged that a prior conviction under section 212.5, subdivision (c) on November 3, 2011, qualified as a "strike" (§§ 667, subds. (c)–(j), 1170.12, subds. (a)–(e)) and a serious felony (§ 667, subd. (a).)  Finally, the information contained sentencing allegations under subdivisions (a)(1)–(4), (a)(6)–(8), and (b)(1)–(5) of the California Rules of Court, rule 4.421.[1]  (Rule references are to the California Rules of Court.)

On August 2, 2024, a jury convicted defendant on all charges and found true the robbery murder special circumstance (§ 190.2, subd. (a)(17)(a)), and the firearm enhancements (§ 12022.53, subd. (d).)  In a bifurcated proceeding, the trial court found true beyond a reasonable doubt the prior serious felony and prior strike allegations.  The

---

[1] The information also charged Sebastian Parra (Parra) with murder and attempted robbery.

2.

court also found true beyond a reasonable doubt the sentencing allegations under rule 4.421, subdivisions (a)(1)–(4), (a)(6)–(8), and (b)(1)–(5).[2] At sentencing, the court said it would not consider the allegations under subdivisions (a)(1) and (2) because it would constitute dual use of facts.

The trial court sentenced defendant to life in prison without the possibility of parole on count 1, plus 25 years to life under section 12022.53, subdivision (d), plus five years under section 667, subdivision (a). On count 2, the court sentenced defendant to six years, plus 25 years to life for the section 12022.53, subdivision (d) enhancement, plus five years for the section 667, subdivision (a) enhancement. The court sentenced defendant to six years in prison on count 3. The court stayed punishment for counts 2 and 3 pursuant to section 654.

## FACTS

On the evening of August 24, 2022, Benny Alcala, Jr. was at home with his wife Valerie Alcala and two sons. (We will use Benny and Valerie's first names for sake of clarity.) At around 7:43 p.m., Benny left to charge his electric vehicle, which he usually did at a charging station at the Target shopping center on Stockdale Highway. Later, Valerie received a notification on her charging station app that the car was overcharging. Valerie called and sent a text message to Benny, but he did not answer. Valerie drove down to the charging station and found police at the scene. She learned Benny had died.

Rian Barraza was driving home from work at around 8:30 p.m. on August 24, 2022, when he noticed two men standing on the side of Stockdale Highway near the charging station. The two men had their arms up in a defensive position and were about one foot apart facing each other. One of the men was wearing a white shirt. Barraza told

---

[2] The reporter's transcript indicates the trial court referred to the allegation regarding prior performance on probation or supervision as rule 4.421, subdivision (a)(5) rather than (b)(5). The description of the factor makes clear the court was actually referring to subdivision (b)(5).

officers the man in the white shirt was a Hispanic man with a medium build around five feet 10 inches tall, who was wearing dark, baggy shorts. The other man appeared to be a black male and was wearing a black shirt and dark pants (though Barraza told officers the man's shirt was gray). Barraza estimated the man to be about five feet eight inches tall.[3]

Barraza then noticed a third individual about 15 yards away. The third individual had a dark complexion and was wearing dark clothing. Barraza told officers the man had a thin build and was possibly transient.

After driving by the men, Barraza heard three gunshots, one of which hit the bed of his truck. Barraza drove away without hearing additional shots or seeing a muzzle flash or anything similar.

Melanie Sanders was traveling west on Stockdale Highway in a vehicle being driven by her son at around 8:45 pm. Sanders heard loud pops, like fireworks or gunshots. She looked out the window to her right and saw a man, facing west, with his arm stretched out as if he was pointing a gun. However, Sanders was unable to actually see a gun. Sanders described the man as "maybe [five feet] 11[ inches], Hispanic" with a medium build. He was wearing a white shirt and dark, baggy shorts that ended between the knee and ankle. The man's white shirt was being illuminated green by the charging station nearby. What appeared to be another person was standing approximately six feet west of the Hispanic man. Sanders could not see if this second person was male or female, and was unable to provide further description.

Rye Nelson lived about a quarter of a mile from the charging station. On the night of August 24, 2022, Rye was standing on his driveway when he heard several gunshots coming from the area of the parking lot servicing the charging station and Target. Rye

_____

[3] According to the information on their driver's licenses, Benny was five feet 10 inches tall and weighed 185 pounds, defendant was five feet eight inches tall and weighed 195 pounds, and Parra was five feet 10 inches tall and weighed 155 pounds.

4.

immediately called 9-1-1 and reported hearing a dozen shots. Upon further reflection, Rye testified at trial that he believed he heard roughly eight shots. Rye's mother, Katherine Nelson, testified she also heard the gunshots at 8:26 p.m. Katherine believed the shots came from either the Target parking lot or a park behind the Target.

At about 9:00 p.m., Gerardo Paulin was walking west on Stockdale Highway towards Buena Vista when he saw someone lying on the sidewalk. Paulin called 9-1-1 and the person he spoke with asked if he wanted to perform chest compressions on the person. Paulin then noticed there was "a lot" of blood on the person's chest and declined to perform chest compressions. Less than two minutes later, police officers responded to the scene. Between the time Paulin came across the person to the time officers responded, he did not see anyone else come down Stockdale Highway.

Officer Ian Whittington with the Bakersfield Police Department and his partner responded to the charging station. They observed a man, later identified as Benny, lying on the sidewalk about 15 feet south of the westernmost charging station. A firefighter eventually took over Benny's care and observed blood and a gunshot wound to his chest. The firefighter pronounced Benny dead at 9:20 p.m.

Benny had two gunshot entrance wounds and two exit wounds. One set of entry and exit wounds indicated a bullet entered just above the elbow on the back of his right arm and exited from the front of the arm. The wound was consistent with Benny having been shot from behind. A second set of entry and exit wounds indicated a bullet entered his lower back just above the hips and exited mid-chest. The bullet hit his spleen, stomach, liver, left lung, and heart. This set of wounds was also consistent with Benny's back having been towards the shooter.

Benny's vehicle was still charging at the station, with no sign of forced entry. A cellphone was found on the ground near Benny's right hand. Benny had a gold-colored necklace around his neck. Benny's wallet, key fob, and an additional cellphone were found in his pockets.

Detectives located six 9mm shell casings at the scene. The casings had the word "Blazer" imprinted on them and the number "9" to indicate 9mm. Subsequent analysis indicated all six shots were fired from the same firearm. An ammunition store in Riverside County had records of Parra picking up a 9mm semiautomatic handgun and 9mm "Blazer" ammunition on August 10, 2021. One detective testified he found no evidence of foot traffic in the area, such as someone having stepped on a shell casing.

Law enforcement located a shoeprint from a Nike Air Force 1 shoe in a dirt area directly behind the charging station.

*Surveillance Footage*

Law enforcement obtained surveillance videos from several retailers in the area. The footage showed defendant entered a BevMo! store at 5:49 p.m., and purchased a 12-pack of hard seltzer, which is an alcoholic beverage. At 7:37 p.m., defendant again entered the BevMo, this time accompanied by Parra. Parra had a maroon t-shirt over his shoulder. Defendant purchased a bottle of vodka.

At around 8:01 p.m., defendant and Parra walked through an alleyway behind the Target. They had McDonald's cups in their hands and they each were wearing a backpack. Parra was wearing a white tank top with a burgundy shirt over his shoulder.

At 8:20 p.m., Benny exited the Target wearing dark gray pants and a gray t-shirt and sandals. At 8:21 p.m., defendant and Parra entered the Target, walked toward the bathroom area, and Parra grabbed his phone. Defendant was wearing black athletic shorts and a white shirt, while Parra was wearing a reddish-burgundy shirt and a hat. Defendant and Parra left about one minute later at 8:22 p.m. They walked toward the area with the charging stations. At 8:27 p.m., footage showed two individuals wearing the same clothing as defendant and Parra walking north into River Walk park.

At 3:35 a.m. the next morning, Parra walked into a restaurant's lobby. Parra was wearing a white tank top. At 5:28 a.m., defendant walked into the restaurant and left about a minute later.

6.

*Tip*

On August 25, 2022, the police department received an anonymous tip. The tipster stated that on August 24 at around 10:50 p.m., he received two text messages from an unknown number stating, "I just killed somebody," and "watch the news." The number that sent the text messages was (661) 855-1795. The parties stipulated that this number belonged to defendant. At trial, the tipster testified he did not know Benny, defendant, or Parra.

Law enforcement later pulled records indicating that between 2018 and 2021, defendant had placed four phone calls while in jail to a number that was two digits off from the tipster's number. In the calls, defendant referred to the person he was speaking with as "cuz" and "primo," which is Spanish for cousin.

Law enforcement believed that defendant's text messages to the tipster were "misdials."

*Parra Transported to Police Department*

Parra was transported to the Bakersfield Police Department on August 29, 2022. Parra was wearing Nike Air Force 1 shoes. The officer who transported Parra brought his backpack, which had a maroon t-shirt inside, among other things.

*Defendant's Arrest and Booking*

Defendant was arrested on September 2, 2022. The officer who accompanied defendant as he was booked into jail testified defendant "mentioned that if he were meant to do it, he would have chosen a place with less cameras, and then shortly after, he advised that he didn't mean to do it." The officer who heard these statements initially failed to document them, believing that telling the lead detective was sufficient. He did eventually write a report some 26 days later.

*Parra's Preliminary Hearing Testimony*

Parra was called as a witness at the preliminary hearing in this case on October 5, 2022. Transcripts from the preliminary hearing were admitted at trial.

Parra testified at the preliminary hearing that he was homeless and had been sleeping in the River Walk area. Parra worked at a restaurant making pizzas. On August 24, 2022, he worked from 7:30 a.m. to 4:00 or 4:30 p.m. After work, he went to the park at River Walk, and "hung out" behind the BevMo. Parra returned to the park at River Walk because he had to use the restroom there. While on his way, a stranger stopped him and identified himself as "AWOL." In court, Parra identified the stranger as defendant. Parra had never met him before. The two men had a conversation that touched on topics including why Parra was homeless and what their lives were like. The two talked for about an hour near the amphitheater at the River Walk park. Defendant said he wanted to buy a bottle of alcohol and Parra said he did not have money. Defendant said he would pay for it. They then went to BevMo and purchased alcohol. Afterwards, they went to McDonald's to get sodas to mix with the liquor. Defendant told Parra he had spent too much money on alcohol, that he needed money, and that he needed to get home.

Later, the two went to Target. Parra believed it was because defendant had to use the restroom. Parra testified that footage showing a man in a maroon shirt and a man in a white T-shirt leaving the Target was he and defendant. While in Target, Parra did not recognize anyone and defendant did not say he recognized anyone.

After leaving Target, they walked by charging stations in the parking lot. Defendant said he needed to get home and mentioned something about ordering a ride from a rideshare app. There was a man at the charging station sitting next to his vehicle. Defendant told Parra the man looked like he had money. As Parra and defendant approached, the man stood up and tried to walk away. Defendant followed the man, and then Parra heard a gunshot. Parra froze and then walked away. Once Parra got past the McDonald's, he realized defendant had rejoined him. The two then walked to the park again. Defendant told Parra, "he shouldn't have walked away." Aside from saying the

8.

man looked like he had money, defendant made no other statements to Parra regarding his intentions.

At some point, defendant told Parra he had to "get back to the hood." When asked if defendant had said he would steal a car if he had to, Parra testified, "Not necessarily, but he said if he had to, like, he would do anything to get home."

At some point, defendant tried to order a ride on his phone, but the driver never arrived. Parra eventually fell asleep near a big box store. When he awoke, he did not see defendant. Parra claimed he never called 9-1-1 because he did not know anyone had been killed.

Parra acknowledged he had a 9mm firearm registered under his name. Parra claimed he had left the gun at the home of a high school friend named Angel Sahagun since May or June 2022. However, Sahagun testified at trial that Parra never had him keep a gun for him.

In December 2022, after his preliminary hearing testimony, Parra was indicted by the grand jury. In February 2023, Ishani Desai, a reporter, interviewed Parra in jail for the Bakersfield Californian. Much of Parra's statements to Desai comported with his preliminary hearing testimony. However, Parra told Desai he did have a firearm with him in his backpack that day. Parra claimed he did not touch the firearm that night but did notice it was missing the next day. Parra said he believed defendant might have taken it from his backpack. Parra said he left the backpack alone with defendant while using the restroom.

Parra also told Desai that when they approached Benny, defendant said, "what's up?" to him. Benny replied, "what's up?" Defendant and Benny then walked away and Parra heard multiple gunshots. When defendant rejoined Parra later, defendant said he "ha[d] to get back to the hood." Defendant also said Benny "should not have tried to walk away."

Parra told Desai he believed defendant killed Benny.

9.

*Facebook Evidence*

Sergeant Nicholas Benavente obtained records of defendant's Facebook account. The account name was "Zaddy AWOL," but Benavente concluded it was defendant's account because defendant was in the account's uploaded photographs.

Defendant's account repeatedly messaged an account named Kevin Johnson. In the messages, defendant said, " 'I just bought a new thang,' " " 'I wanna shoot it,' " and " 'I miss is cuz Mitchy clacc clacc clacc.' " Defendant also said, " 'My trigger finga itching,' " " 'I'm legit rn,' " and " 'Being legit is hard.' " On July 14, 2022, defendant messaged, " 'Cuz but it's not. Easy working part time for nothing when I can just take it.' "

Defendant's account also sent a message stating he had been fired from his restaurant job because he "didn't learn in three days."

On August 28, 2022, defendant's account sent a message stating, " 'You all can't get that reaction out of me no more because I got it out of my system. I slung my iron.' "

*Parra's Cellphone*

Parra's cellphone searched multiple local news station websites on August 25, 2022, including viewing a news story about a shooting outside Target in Southwest Bakersfield.

*Stipulation*

The parties stipulated that defendant had been convicted of a felony prior to August 26, 2022.

## DISCUSSION

I.      Defendant Forfeited his Claim that the Facebook Messages Were Inadmissible Under Evidence Code Section 1101

Defendant contends the trial court erred in admitting his Facebook messages.

*Additional Background*

Before trial, the prosecution moved to admit defendant's Facebook messages. The prosecutor argued defendant's message saying it was not easy to work when " 'I can just take it' " was indicative of his intent on the night in question, and was not being used as character evidence. Defense counsel objected "under [Evid. Code, section] 352[,] under hearsay and as well as just the remoteness of these conversations."

The trial court concluded the probative value of the evidence outweighed its prejudicial effect. The court also reasoned that the Facebook messages showed intent and motive, which were admissible purposes under section 1101. Ultimately, the court ruled that if proper foundation was laid at trial, the Facebook messages would be admitted.

At trial, the trial court instructed the jury with respect to the Facebook messages as follows:

> "If you decide that [defendant] committed this other behavior [i.e., sending the Facebook messages], you may, but are not required to, consider that evidence for the limited purpose of deciding whether [defendant] acted with the intent to commit the crimes in this case, [defendant] had a motive to commit the offenses alleged in this case, and/or [defendant] had access to a firearm.

> "In evaluating this evidence, consider the similarity or lack of similarity between the other behavior and the charged offenses. Do not consider this evidence for any other purpose. Do not conclude from this evidence that [defendant] has a bad character or is disposed to commit crime. If you conclude that [defendant] committed this other behavior, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that [defendant] is guilty of the charged crimes. The People must still prove each charge beyond a reasonable doubt."

11.

In closing argument, the prosecutor referenced the Facebook messages. The prosecutor told the jury,

> "Now you have an instruction on this. You can't find that he's got any bad character or propensity from this. Read that instruction for all the text messages—or strike that, the Facebook messages that predate the homicide. You can consider it, though, for motive in this case. Is there a reason why he approached [Benny] Alcala? Because being legit is hard? Because he got fired from [a restaurant]? Because he didn't learn in three days. He says that further on July 19th. Because it is hard being legit when you can just take it. You consider that for motive and his intent in this case for that purpose."

A. Analysis

Defendant contends the Facebook messages constituted character evidence inadmissible under Evidence Code section 1101. The Attorney General contends, and we find, that this contention has been forfeited.

By statute, a judgment may not be reversed due to the erroneous admission of evidence unless the defendant made a timely objection, stating the "specific ground" of the objection. (Evid. Code, § 353; see *People v. Thornton* (2007) 41 Cal.4th 391, 430, fn. 6; *People v. Champion* (1995) 9 Cal.4th 879, 918, overruled on another issue as recognized in *People v. Combs* (2004) 34 Cal.4th 821, 860.)

Here, defendant objected on Evidence Code section 352 grounds, hearsay grounds, and on the grounds the statements were "remote" in time. By definition, none of these are objections on Evidence Code section 1101 grounds. (See, e.g., *People v. Gallego* (1990) 52 Cal.3d 115, 174 [objection under Evidence Code section 352 did not preserve character evidence issue].)

In response to the Attorney General's contention on this point, defendant cites generally to a 16-page block of the reporter's transcript, claiming the discussion contained therein "sufficiently apprised" the trial court of the issue to be decided. If a specific objection on character evidence grounds had been made, defendant would be

12.

obligated to cite it directly. Instead, we are directed to a lengthy discussion that touched on various theories of admissibility for the evidence. The vast majority of the discussion was between the prosecutor and the court, rather than argument by defense counsel. It is true that, at one point, the *prosecutor* argued the evidence was *not* character evidence, and the court agreed. But this is not equivalent to an *objection* "of record" that was "so stated as to make clear the specific ground of the objection." (Evid. Code, § 353.) Analogously, in *Champion*, the prosecutor defended the admissibility of prior act evidence by noting it showed a similar modus operandi to the charged crime. This argument is pertinent to defending the evidence against an Evidence Code section 1101 objection. (See *People v. Jones* (2013) 57 Cal.4th 899, 925.) Yet, since the defense made no objection specifically on Evidence Code section 1101 grounds, the issue was still found to be forfeited despite discussion on the topic.[4] (*People v. Champion*, *supra*, 9 Cal.4th at p. 918.) Thus, the fact a discussion may touch on a particular admissibility issue does not necessarily dispense with the need for the defendant to raise a specific objection.[5]

    II.    There was Substantial Evidence to Support the Attempted Robbery Conviction and the Attempted Robbery Special Circumstance

Defendant contends there was insufficient evidence to support the attempted robbery conviction and the attempted robbery special circumstance.

---

[4] Within this argument, defendant also suggests it was "unfair" to introduce evidence of his financial circumstances to establish motive for a robbery. To the extent this is an objection separate from the character evidence issue, it too was forfeited for lack of objection below.

[5] In any event, we likely would have agreed with the trial court that the evidence does not run afoul of Evidence Code section 1101, because it was offered to prove defendant's motive and intent. (See Evid. Code, § 1101, subd. (b) ["Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as *motive*, opportunity, *intent*, preparation, plan, knowledge, identity, absence of mistake or accident .…)," italics added].)

*Substantial Evidence Review*

" ' "To determine whether sufficient evidence supports a jury verdict, a reviewing court reviews the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable jury could find the defendant guilty beyond a reasonable doubt." ' [Citation.] ' "This standard of review applies when the evidence is largely circumstantial and to review of special circumstance findings." ' [Citation.]

" 'When reviewing the sufficiency of evidence to support a special circumstance, the relevant inquiry is " 'whether, after viewing the evidence in the light most favorable to the People, *any* rational trier of fact could have found the essential elements of the allegation beyond a reasonable doubt.' " [Citation.] We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence.' [Citation.] ' " ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment." ' " ' [Citation.] 'A reviewing court neither reweighs [the] evidence nor reevaluates a witness's credibility.' [Citation.] Reversal is not warranted 'unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction.]" ' " (*People v. Thomas* (2023) 14 Cal.5th 327, 377–378 (*Thomas*).)

*Attempted Robbery*

" 'Attempted robbery requires the "specific intent to commit robbery and … a direct but ineffectual act toward the commission of the crime." ' " (*People v. Scully* (2021) 11 Cal.5th 542, 584.)

*Analysis*

As set forth below, there was plenty of evidence from which a jury could have concluded defendant committed an attempted robbery. Evidence adduced at trial

14.

supported the following inferences.  In the months leading up to the shooting, defendant sent messages saying it was not easy working part time for nothing when he could "just take it," and that his trigger finger was itchy.  He later said he had been fired from his job.  On the night in question, he and Parra approached a man (Benny) they did not know after defendant said the man looked like he had money.  Defendant and Benny walked away from Parra, and then Parra heard gunshots.  Within hours after the shooting, defendant texted someone that he had "just killed somebody."

From this evidence, the jury could reasonably infer that defendant intended to rob Benny, and shot him as an act toward accomplishing the robbery.  Our substantial evidence review ends at this conclusion.

Defendant points to other aspects of the evidence that could be interpreted in a manner favorable to his position.  For example, he notes Benny's body was found with or alongside several valuables—e.g., his cellphones, wallet, and a gold-colored necklace.

First, while an inference favorable to defendant could be drawn from this evidence, there are also neutral inferences that could be drawn from this evidence.  In other words, the fact a person retained items of value does not preclude the possibility they were the victim of an attempted robbery.  For example, defendant may have become concerned that the number of gunshots necessary to incapacitate Benny could have alerted people nearby, making any subsequent taking of valuable items too risky.[6]

---

[6] The prosecutor argued to the jury, "He was killed on a major thoroughfare.  He was bloody.  There were people around.  That is why they fled.  He was down on the street.  That is why no property was taken."  Defendant argues the prosecutor "misstated the facts."  He notes the man who found Benny while walking down Stockdale Highway testified no other people came down Stockdale Highway.  And a detective testified he found no evidence of foot traffic at the scene.

But the absence of people walking on Stockdale Highway does not preclude people *driving* down Stockdale Highway, or walking nearby in areas *other* than Stockdale Highway.  Indeed, the same detective testified that Stockdale Highway is a high vehicle traffic area.  In addition, several drivers testified to actually witnessing the events leading

Second, and more importantly, even if the only reasonable inference from this evidence was entirely favorable to defendant, it would not warrant reversal on substantial evidence review. Because once we determined there was substantial evidence of an attempted robbery, it is irrelevant that some of the other " ' " ' "circumstances might also be reasonably reconciled with a contrary finding." ' " ' " (*Thomas*, *supra*, 14 Cal.5th at pp. 377–378.)

Defendant contends Parra's testimony that defendant said Benny looked like he "had money" constituted accomplice testimony and thus required corroboration. (See § 1111.) Defendant's formulation is imprecise. While an accomplice's testimony must generally be corroborated by independent evidence, that evidence does not need to corroborate everything to which the accomplice testifies. (*People v. Davis* (2005) 36 Cal.4th 510, 543.) It need only " 'tend[] to connect the defendant with the crime charged.' " (*People v. Rodrigues* (2018) 4 Cal.5th 1123, 1128.) There was overwhelming independent evidence connecting defendant to the crime, including surveillance footage showing him in the area minutes before the shooting, as well as his text message within hours stating he had just killed someone and suggesting the killing would be on the news. The fact there was no corroborating evidence as to defendant's specific statement that Benny looked like he had money does not preclude our consideration of this statement on substantial evidence review.

According to defendant, only the shooting was corroborated, not the attempted robbery. But corroboration is simply independent evidence tending to "connect" the defendant to the crime. And there was plenty of independent evidence connecting defendant to the attempted robbery: defendant's Facebook messages, the surveillance footage putting him in the area of the confrontation minutes beforehand, a witness seeing

---

up to the shooting. Thus, it is clear there were people in the area—certainly within earshot of gunfire—even if there was no foot traffic at the immediate crime scene or on Stockdale Highway.

a man holding is arm outstretched toward another man, and a witness seeing two men with their arms up. While it is true defendant's statement that Benny looked like he had money was not independently corroborated, corroboration is not required for every fact to which an accomplice testifies.

Finally, defendant argues evidence of his "financial straits" is not admissible to prove motive or intent in a robbery case. We have found no objection on those grounds in the record, and the issue is thereby forfeited. But even if the argument were not forfeited, it is meritless here. "Generally, evidence of a defendant's poverty or indebtedness is inadmissible to establish a motive to commit robbery or theft, 'because reliance on poverty *alone* as evidence of motive is deemed unfair to the defendant, and the probative value of such evidence is considered outweighed by the risk of prejudice.' " (*People v. McDermott* (2002) 28 Cal.4th 946, 999, italics added.) But the evidence here was not that defendant was poor and therefore was likely to commit a robbery. Instead, defendant sent messages stating it was not easy working part time when he could "just take it," and that he had been fired. This evidence is not even primarily about defendant being poor, and it is certainly not based on poverty "alone." Instead, it indicates defendant might prefer (or was considering) to take money from others rather than earn it through employment. This is highly probative to the crime with which he was charged and was not based merely on defendant being poor. In other words, this is not " 'reliance on poverty alone,' " as criticized by cases like *McDermott*.

III.  Defendant's Firearm Possession Conviction was Supported by Substantial Evidence

Defendant argues the only evidence he possessed a gun was the testimony of his accomplice, Parra, and therefore corroboration was required. But, as noted above, not every fact to which an accomplice testifies must be corroborated. Corroborating evidence need only tend to connect defendant to the crime. (See *People v. Rodrigues*, *supra*, 4 Cal.5th at p. 1128.)

17.

There was plenty of evidence tending to connect defendant to the crime of possessing a firearm as a felon.  Independent evidence supported the inference defendant had sent a text message saying he had just killed someone and to "watch the news" within hours after a man was shot to death with a gun in an area defendant was seen on surveillance footage minutes before.  This was more than enough to connect defendant to the crime apart from Parra's testimony.

Defendant's suggestion Parra's testimony was self-interested and contradicted by other evidence and therefore should be viewed with some skepticism is well taken as far as it goes.  But the argument is not material on substantial evidence review since we do not reweigh evidence or witness credibility.  (See *Thomas*, *supra*, 14 Cal.5th 327, 378.)

## DISPOSITION

The judgment is affirmed.

PEÑA, J.

WE CONCUR:


DETJEN, Acting P. J.


HARRELL, J.